IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs July 13, 2021

**STATE OF TENNESSEE v. TARIK DESHAWN NEWMAN**

**Appeal from the Criminal Court for Davidson County**
**No. 2018-B-708     Steve R. Dozier, Judge**

_____

**No. M2019-01986-CCA-R3-CD**

_____

The Davidson County Grand Jury indicted Defendant, Tarik Deshawn Newman, for one count each of aggravated robbery, especially aggravated kidnapping, evading arrest in a motor vehicle with risk of death or injury, and theft of property valued between $1,000 and $10,000. Following a trial, a jury convicted Defendant as charged, and the trial court sentenced Defendant to an effective sentence of nineteen years' incarceration with a 100 percent release eligibility. On appeal, Defendant argues (1) that the State withheld evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and in violation of Tennessee Rule of Criminal Procedure 16; (2) that the trial court erred in admitting evidence in violation of Tennessee Rules of Evidence 403 and 404(b); (3) that the evidence was insufficient to support his convictions; (4) that the trial court erred in denying Defendant's Motion for Judgment of Acquittal; and (5) that the sentences were excessive. Following a thorough review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which TIMOTHY L. EASTER and J. ROSS DYER, JJ., joined.

Ashley Preston, Nashville, Tennessee, (on appeal); and Martesha Johnson, District Public Defender, and Jennifer Dusenberry and Cantrell Storie, Assistant District Public Defenders, (at trial) for the appellant, Tarik Deshawn Newman.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Senior Assistant Attorney General; Glenn R. Funk, District Attorney General; and Wesley King and Kate Melby, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**Factual and Procedural History**

This case arises from the kidnapping and carjacking of the victim, Latara Conley. Following a car chase by police, which occurred six days after the offense, Defendant and Co-Defendant Marcus Hendricks wrecked the victim's stolen car and then fled the scene. After a foot chase, both were arrested. During the foot chase, Defendant discarded his cell phone and weapon, which were recovered by the police. At the preliminary hearing and at trial, the victim identified Defendant as the assailant who kidnapped her and stole her vehicle.

*Pretrial Motion to Dismiss*

On the date trial was set, April 16, 2018, defense counsel filed a Motion to Dismiss the case against him due to a violation of *Brady v. Maryland*, 373 U.S. 83 (1963). She argued that she twice filed with the State a discovery request for all *Brady* material and a demand for material subject to disclosure under Tennessee Rule of Criminal Procedure 16.[1] Counsel said that, two days before trial,

> [o]n April 14, 2018, at 4:30 PM, the State provided counsel with an additional 4 pages to Detective Haislip's report, an additional crime lab report, and photos of [Defendant]. Detective Haislip's report states that a search warrant was executed on [Defendant]'s recovered phone and sent to SISU to be examined. The report also states that Detective Haislip was informed that "the chip off on the suspect['s] phone" was not successful and that no data was recovered. This is the first time that [c]ounsel has received any notice that [Defendant's] phone was tested. At this point, [c]ounsel still has not received a copy of the search warrant for the phone or any reports from SISU.
>
> On April 15, 2018, [c]ounsel received an email from the [S]tate which contained two documents, a Forensic Services Request and a report from Crime Scene Investigation/Evidence Processing Unit. The documents indicate that forensic testing was requested on a Taurus Revolver and on live rounds, which were both recovered on January 14, 2016. The Crime Scene Report indicates that no latent prints were developed.

Counsel stated that the assailant who forced himself into the victim's car made a phone call while in the car. Moreover, she said that one of the co-defendants discarded a

---

[1] The record on appeal does not have a copy of either discovery request by Defendant.

cell phone and handgun during a foot chase by police. Counsel asserted that, since no data was found on the phone and no fingerprints were found on the weapon, this evidence was "absolutely exculpatory" given that the gun and phone "played such a pivotal part in the alleged offense" against the victim. She also argued that Defendant would be prejudiced by a continuance because he was unable to exercise his right to confront witnesses effectively on his scheduled trial date and because a continuance would violate his speedy trial rights.

Defense counsel also contended that the State's failure to disclose showed a "pattern of late disclosures" in Defendant's case. She noted that, ten days prior to his first trial date in March 2017, the State "disclosed jail calls from [Defendant] for the first time. Twelve days prior to that same trial date, the [S]tate disclosed a recorded interview of [Defendant] and [Co-Defendant] Hendricks." After the March 2017 trial date was continued, the State "provided [c]ounsel with surveillance footage of the alleged [offense] that had been sitting in the lead detective's desk since early 2016."

*Motion to Dismiss Hearing*

The trial court held a hearing on the motion to dismiss and the motions in limine, and defense counsel argued that the late disclosure of the cell phone testing and fingerprint testing prejudiced the defense because she was planning to argue at trial that a lack of testing showed a "sho[dd]y investigation." Counsel also argued that she did not have time to review the testing or to see what other type of testing should be done; thus, she could not effectively cross-examine this late evidence. Counsel stated:

> I understand that a dismissal of this indictment is an extreme remedy. But I think it's warranted given, first off the exculpatory nature of the items we have received this weekend, given the length of time [Defendant] has been in custody but also given the pattern of late disclosures on the history of this case.

Regarding the testing report for the cell phone, the prosecutor responded that "sometime between August 10th, 2017, and . . . Friday of last week, I'm pretty sure I received [] that particular documentation." The prosecutor noted that he offered open file discovery to defense counsel in August 2017 and that defense counsel chose not to avail herself of that option. Defense counsel responded that under *Brady*, the State was required to affirmatively disclose exculpatory evidence; the defense was not required to sift through the State's files. Moreover, defense counsel was not given a search warrant for the phone, so she had no reason to believe that it had been searched.

- 3 -

The trial court denied the Motion to Dismiss, stating, "I do not find that the State has in any way grossly or intentionally withheld evidence from [Defendant] or his counsel." However, the trial court noted that it believed that the new evidence would change Defendant's trial strategy, so it ordered a continuance until July 9, 2018.

*Pretrial Motions in Limine*

On April 16, 2018, defense counsel and the State filed several Motions in Limine, and the trial court heard the motions on July 5, 2018. We will limit our discussion to issues raised on appeal.

In discussing the possible admission of four of Defendant's Facebook photographs, defense counsel argued that there was no way to know when the photographs of Defendant were taken, which lowered their probative value. She argued that the photographs were highly prejudicial because of other individuals in the photographs wielding weapons and flashing gang signs, because Defendant appeared to be smoking marijuana in one photograph, and because Defendant held weapons in two of the photographs. She argued that the photographs should be excluded under Rule 404(b) as propensity evidence. The trial court denied Defendant's motion to exclude the Facebook photographs, subject to redaction of Defendant's friends and gang signs and symbols.

The trial court granted Defendant's motion in limine "to exclude any evidence, documentary proof and/or witnesses that should have been disclosed pursuant to [D]efendant's request for discovery and which [was] not [] disclosed to [D]efendant prior to trial."

*Trial*

The victim testified that she lived on Arbor Crest Boulevard in Antioch on January 14, 2016. At approximately 10:00 a.m., she was coming home from running errands. The victim stopped her 2007 silver Camry at the entrance of the apartment complex and took trash out of her car trunk to put into the compactor. She said that, when she turned back around, Defendant was facing her and pointing a black handgun at her. Defendant told the victim, "You're driving," and he forced her into the car on the driver's side. He sat behind the victim and instructed the victim to "stop looking" at him. Defendant asked if the Camry had any kind of tracking device. The victim responded that it did not.

Defendant directed the victim to drive to another apartment complex on Hamilton Church Road. While they were driving, Defendant took the victim's driver's license from her purse, made a phone call on a white cell phone, and said to the other person on the line, "I have a car. [I]f I go to jail for this, I want you to go to this address and kill everyone in

- 4 -

the home." The victim testified that Defendant gave the person her home address from her driver's license. When the victim and Defendant arrived at the second apartment complex, Defendant let the victim retrieve her phone, her Kindle tablet, and her groceries from her car. However, Defendant kept the victim's purse and driver's license. Defendant told the victim, "I know you have to report this for insurance, but you better . . . just say it was stolen. . . . [a]s opposed to a carjacking." Defendant then drove away in the victim's car. The victim testified that she was with Defendant for eight to ten minutes.

The victim stated that she called the police and gave them a description of the assailant as an African-American man, "[v]ery young, between [nineteen] and [twenty]." She said that he was approximately five feet, six or seven inches tall and weighed about "120 or 130." The victim described the assailant's hair as black with short "dread locks" and said that he wore a dark-colored winter stocking cap. She told police that the assailant was wearing a dark jacket.

The victim testified that the approximate value of her Camry at the time of the offense was $8,000 to $9,000. She said that, six or seven days after the offense, Metro Nashville Police Department ("MNPD") contacted her to say that her car had been located. The victim recalled that she went to the police impound lot and saw that her car was "pretty beat up." She stated that it was "totaled out" by the insurance company. After reviewing photographs of the damage to the Camry, the victim stated that the damage was not present when Defendant took the car from her.

Video surveillance footage near the trash compactor was played for the jury. While watching the video, the victim testified that she was the person standing near the compactor. She pointed out Defendant on the video as he approached her and confirmed that she and Defendant were the persons who got into her car and drove away.

The victim testified that she met with MNPD Detective Shade Haislip about a week after the offense and that she viewed a photo array. She said that she immediately recognized photo number four, Defendant, as her assailant but that she told Detective Haislip that she could not identify anyone. The victim explained at trial that she was still very afraid when she met with Detective Haislip because Defendant still had her driver's license and address, so she did not identify anyone at that time. She said that she was "absolutely positive" that photo number four was her assailant.

The victim recalled that, on February 2, 2016, she testified at a preliminary hearing and identified Defendant as her assailant. She explained that, prior to trial, she saw a photograph of Co-Defendant Hendricks and that she had never seen him before. The victim explained that she was positive that Co-Defendant Hendricks was not her assailant because

- 5 -

Defendant and Co-Defendant Hendricks had "two different complexions[,] and they don't look alike."

On cross-examination, the victim said that, when she first saw Defendant, she was focused on the gun in his hand. The victim agreed that Defendant sat behind her in the car and said that she looked at him through the rearview mirror. The victim recalled that, when they stopped at the second apartment complex and she got out of the car, Defendant handed her phone and tablet to her without wearing gloves.

The victim testified that she cooperated with Detective Haislip following the offense and allowed him to search her recovered car. She said that she agreed to meet with Detective Haislip a week after the offense because she did not want the person who robbed her to "be on the streets." She agreed that she did not identify anyone from the photo array that day but that she identified Defendant two weeks later at the preliminary hearing. The victim agreed that, when she arrived in court for the preliminary hearing, the bailiff brought Defendant from a side door and that Defendant was the only person in the courtroom wearing an orange jumpsuit and handcuffs. The victim stated that the first time she saw a photograph of Co-Defendant Hendricks was the day before trial and that Co-Defendant Hendricks was not included in the photo array.

On redirect examination, the victim explained that she chose to identify her assailant at the preliminary hearing because she "just decided [she] was not going to live in fear because that's no way to live." She explained, "I didn't want to see this happen to anyone else."

MNPD Detective Derrick Moore testified that, in January 2016, he was a patrol officer assigned to a "flex team." He explained that a "flex team" was a "proactive unit . . . assigned to basically concentrate our efforts into high crime areas." He said that, on January 20, 2016, he "ran a tag" on a Camry and that the database indicated that the Camry had been stolen in a carjacking six days prior. Detective Moore said that he then contacted dispatch and began to follow the Camry at a safe distance. The Camry suddenly began to accelerate at a high rate of speed and almost caused a wreck, so Detective Moore activated his blue lights. The Camry continued to evade Detective Moore's pursuit and sped through rush hour traffic at approximately 4:45 p.m. Detective Moore explained:

> While I observed the vehicle, it crossed into oncoming traffic two separate times. The second time, it nearly caused an accident. The vehicle [h]ad to slam on their brakes causing the Toyota [Camry], the driver of the Toyota [Camry] to jerk the car immediately back right, nearly running off of the right side of the road.

. . . .

I could see them once again go into oncoming traffic. And when they made the hard -- another aggressive maneuver back to their lane, they over corrected and they went off of the road. At that time, they went into a drainage ditch, through two to three yards, and then they wrecked into a parked car at a house.

Detective Moore testified that two Black males, Defendant and Co-Defendant Hendricks, exited the vehicle and fled on foot. Officer James Caruth and another officer pursued them on foot while Detective Moore secured the Camry. Detective Moore said that Defendant was wearing red jogging pants and a dark jacket. After Defendant and Co-Defendant Hendricks were in custody, Detective Moore walked to the edge of the property where they had crashed and located a revolver and white iPhone on the ground. He recalled that crime scene investigators also found a brown semi-automatic 45-caliber handgun.

On cross-examination, Detective Moore agreed that Co-Defendant Hendricks was "African American" and wore "dread locks" in his hair. Detective Moore agreed that, at Co-Defendant Hendricks's juvenile detention hearing, he testified that Defendant and Co-Defendant Hendricks "looked much the same."

On redirect examination, Detective Moore stated that he was not the arresting officer of either Defendant or Co-Defendant Hendricks. Detective Moore said that he could tell Defendant and Co-Defendant Hendricks apart by sight.

Officer Caruth testified that he worked as a "flex" officer and that he mostly looked for guns in high crime areas. He said that, on January 20, 2016, he heard Detective Moore radio that a stolen vehicle was traveling at a high rate of speed near his location. Officer Caruth saw the vehicle pass by him, and he pulled out behind it and activated his blue lights. He chased the vehicle until it crashed at a home on Neely's Bend. Officer Caruth pulled up next to the car, and the driver's side door opened. Two Black males exited the vehicle. Defendant was the second person to exit the car, and he was wearing red pants. Officer Caruth chased the two men and saw something fall from Defendant's person. Officer Caruth was wearing his police uniform and called out to Defendant and Co-Defendant Hendricks that he was a police officer and told them to stop. Officer Ryan Sable joined the foot pursuit. Officer Caruth was able to take Defendant into custody, and Officer Sable pursued Co-Defendant Hendricks and took him into custody. Officer Caruth located the victim's driver's license in a "stack of IDs" on Defendant's person.

After placing Defendant in a police vehicle, Officer Caruth retraced his steps from the foot chase and located what Defendant had dropped. Officer Caruth found the 45-

caliber semi-automatic brown handgun that fell from Defendant's person during the foot chase and pointed it out to the crime scene investigators. He said that another officer directed his attention to a black revolver found on the scene.

During a jury-out hearing, the State requested that it be permitted to show a mugshot of Co-Defendant Hendricks to Officer Caruth and then publish it to the jury. Defense counsel objected, stating that the trial court granted the motion in limine to exclude all evidence not included in discovery. The trial court responded that, until the State learned that Defendant's theory of defense was mistaken identity and that Co-Defendant Hendricks was the actual assailant, the State was not planning to use the mugshot of Co-Defendant Hendricks to rebut that theory. The prosecutor said that he printed the mugshot of Co-Defendant Hendricks the morning before trial. Defense counsel argued that her defense theory was "fairly obvious" before trial and that the prosecutor clearly anticipated this defense because he printed the mugshot before hearing her opening statement. She stated that Defendant would be prejudiced because she planned her defense thinking that the State "would use the evidence that ha[d] been provided to [her] in discovery." Defense counsel said that she "didn't think they would have a picture [of Co-Defendant Hendricks] because none was ever provided to [her] and that would clearly be material to [her] preparing a defense."

The prosecutor stated that the RMS system was the system from which he printed the mugshot of Co-Defendant Hendricks prior to trial. He said that, during open file discovery, he took defense counsel to the RMS system and asked her what, if anything, she wanted to see. The prosecutor argued that defense counsel knew that Co-Defendant Hendricks had been arrested before and would have his mugshot in the RMS system but that defense counsel never requested the mugshot of Co-Defendant Hendricks during discovery.

The trial court stated that defense counsel had months to prepare for trial and that she opened the door when she cross-examined the victim and officers about the appearance of Co-Defendant Hendricks. The trial court stated that, under Tennessee Rule of Criminal Procedure 16, the State was only required to provide documents that would be material to preparing the defense and that, if the State did not know what the defense theory was, then "they don't know that it's material." The trial court concluded, "[S]hould the State have been aware that a photo of [Co-Defendant] Hendricks would be material to preparing the defense? The answer to that is no." Defense counsel stated, "Under that theory, then they would never have to provide anything to us because they are never going to know exactly what our defense is." The trial court ruled that the photograph was admissible.

When the jury returned, MNPD Officer Bryan Dewalt testified that he worked as a "flex" officer and that, in January 2016, he transported Co-Defendant Hendricks from the

scene of his arrest to the police department. Officer Dewalt said that the photograph admitted by the State "looked like" Co-Defendant Hendricks. He said that the most he remembered was "the hair, because, you know, it's been about two years, but that's the hair I remember."

MNPD Detective Shade Haislip testified that, on January 14, 2016, he responded to the apartments on Arbor Knoll Boulevard and met the victim. He said that he met with the victim again on January 21, 2016, and that he showed her a photo array which included Defendant. Detective Haislip recalled:

> When I showed her the lineup, she repeatedly looked at photograph number four, which is a photograph of [Defendant] and made eye contact with that photograph for an extended period of time. And she stated several times that she was afraid. She didn't want her family hurt, statements of that nature. And all of the while still looking at photograph number four. And at the very end of it she finally did not pick anybody out.

Detective Haislip stated that the unit in the MNPD that extracts information from cell phones was unable to extract any information from the white cell phone recovered from the scene of the arrest. Detective Haislip reviewed four photographs taken from Defendant's Facebook profile. The first photograph depicted Defendant wearing red pants and no shirt and standing next to another Black male who was pointing a pistol towards the camera. The second photograph depicted Defendant wearing "dark pants and a dark top with a black knit cap[.]" The third photograph portrayed Defendant "holding up two guns [--] a revolver and then another is a semi-automatic pistol." The fourth photograph pictured Defendant "holding up a small semi-automatic pistol in his hand with another subject directly behind him [] holding [a] black revolver."

On cross-examination, Detective Haislip testified that he had conducted hundreds of photographic lineups in his career. He agreed that, upon an identification of a suspect, he was supposed to document "any observations and statements" by a witness. He agreed that he did not write anything on the lineup form or in his report indicating that the victim was looking at Defendant's photo during the lineup or that the victim stated she was afraid for her family. Detective Haislip agreed that the lineup forms and police reports must be accurate and thorough because officers often testify months or years after a lineup is conducted. Detective Haislip stated that, when he conducted the lineup, he knew that photograph number four was of Defendant and that Defendant was the suspect. He said that he did not show the victim a photograph of Co-Defendant Hendricks during the lineup.

Detective Haislip agreed that he did not attempt to obtain the call records or location records for the recovered white cell phone. He stated that the victim's items that she had

with her at the time of the offense were not fingerprinted. He said that he never attempted to obtain the cell phone records or GPS records for the recovered cell phone because he "did not know the number for that phone."

MNPD Crime Scene Investigator Courtney Bouchie testified that she responded to the scene of Defendant's arrest on Neely's Bend on January 20, 2016, and that she noted tire tracks in the snow on the grass, a broken mailbox, and a broken fence. Investigator Bouchie said that a silver Camry was on the scene and that it had collided with a vehicle parked at the home on Neely's Bend. During her walkthrough of the scene, Investigator Bouchie photographed and collected a Taurus .38 special revolver, a white Samsung cell phone, and a .45-caliber semi-automatic pistol. She said that the weapons and phone did not have snow, ice, or rust on them, indicating that they were recently discarded. She stated that the semi-automatic pistol had a bullet chambered, was cocked, and had the safety lock removed, so it was ready to fire. Investigator Bouchie spoke with the homeowner at Neely's Bend who said that he did not own the semi-automatic pistol.

Investigator Bouchie explained the absence of fingerprints on the collected items:

Despite what we see on TV, fingerprints can be fleeting. If our hands are sweaty or if we swipe across something, we may or may not leave good fingerprints. And not only that, but if those fingerprints aren't of a quality nature, they may not come back to anybody.

During a jury-out hearing, defense counsel moved for judgment of acquittal, arguing in part that, because Co-Defendant Hendricks was the driver of the vehicle at the time of the arrests, the evidence was insufficient to charge the jury with evading arrest and theft of property valued between $1,000 and $10,000. The trial court denied the motion, concluding that the jury would determine whose testimony to credit and would determine whether Defendant was guilty for exercising control over stolen property and/or criminal responsibility for evading arrest.

The jury convicted Defendant in count one of aggravated robbery, in count two of especially aggravated kidnapping, in count three of evading arrest in a motor vehicle with risk of death or injury, and in count four of theft of property valued between $1,000 and $10,000.

*Sentencing and Motion for New Trial*

At the sentencing hearing, Dr. Pattie Van Eys testified as an expert in clinical psychology and said that, based upon the "wealth of records" she reviewed and interviews with Defendant, he had experienced complex chronic trauma as a child which had "wire[d]

the brain differently." She said that Defendant was removed from his home and put in the foster care system at age four. Prior to his admission to foster care, Defendant experienced ten out of ten "adverse childhood experiences" ("ACEs"), which included "physical abuse, physical and emotional neglect[,] [s]exual abuse, domestic violence of the mother, incarceration of a family member, substance abuse in the family, mental illness in the family, divorce or separation of the parents[,] and psychological abuse[.]" She explained that having eight or more ACEs occurred in one out of 1,000 people in America and "means that that childhood was very violent and abusive, neglectful, chaotic[,] and it changes the development of the child."

Dr. Van Eys explained that Defendant's father stabbed his mother and beat her. Defendant's father was hospitalized in a mental hospital because he had "command hallucinations" to kill Defendant's mother. Defendant's father was diagnosed with schizophrenia. Defendant's father beat Defendant and his siblings with belts to their heads, groins, and backs. Defendant's father sexually abused and impregnated Defendant's sister and was incarcerated for sexual and physical abuse. Defendant's father "had sex with the kids" and beat them, and the siblings were made to sexually abuse one another.

Dr. Van Eys testified that Defendant experienced homelessness with his birth family and "lots of transiency." The Department of Children's Services ("DCS") reported that Defendant's home was "in deplorable conditions" and "infested with insects." The home was filthy, and there was no food in the cupboards or refrigerator. Dr. Van Eys said that the children were not supervised and that they were "sometimes on the roof" and "were vandalizing the neighbor's home."

DCS removed the children and placed them into different foster care homes when Defendant was four and a half years old. Dr. Van Eys reported that, when Defendant entered foster care at age four, he already had a problem with profanity, which showed that he had been in an environment of psychological abuse. Defendant's mother admitted to hitting and yelling at Defendant and his siblings. Defendant's mother had a criminal record and a substance abuse problem. Defendant's parents separated, and Defendant's father "ended up leaving the family[.]" When Defendant was six years old, the court allowed him to return to his mother in a "trial home visit. . . . [T]hat lasted five months and it went very badly." Defendant's mother did not supervise the children, and they got into a great deal of trouble. She took the children out of state without notifying DCS, so when the children were located, they were returned to foster care. Defendant's mother's parental rights were terminated shortly thereafter.

Defendant and one of his brothers were then adopted by the Newman family, but after five years, the Newmans returned the boys to the State and "said they couldn't handle them anymore." Dr. Van Eys stated that Mr. Newman, Defendant's adoptive father, would

provoke Defendant "until he would say something verbally back[,] and then it would give him cause to go ahead and strike [Defendant] with boards from Home Depot." Dr. Van Eys explained that, when Defendant was returned to foster care as a teenager, the neighborhood he lived in exposed him to gangs and that he was "given guns[.]" One of Defendant's teenage friends was killed by gun violence. Dr. Van Eys concluded that Defendant suffered from "all ten ACEs" in Defendant's "first four and [a] half years."

Dr. Van Eys explained that Defendant's brain was rewired to believe there was "constant threat, chaos, danger, needs not getting met." She said,

> [I]n the very early stages it's setting up for the later brain to be like: Boom, if I'm reminded by a sight, a smell, a sound, a deep voice, because that's the kind of person that used to hit me when I was little, whatever that threat might be, the amygdala doesn't think, it simply reacts to survive.

She explained that Defendant's early brain was damaged by trauma to the point that he could not appreciate the consequences of his actions and could not think through decisions. Dr. Van Eys said that not everyone with a chronic complex trauma in early childhood had a bad outcome because they would have a "protective factor," like a church community, teachers and mentors, or an adoptive family, that would help the child develop competence. She explained that Defendant did not have one single adult in his childhood who invested in him. Dr. Van Eys concluded that Defendant still had the opportunity to grow and "change the wiring" in his brain because he was "still quit[e] young." Defendant was age twenty-one at the time of sentencing.

On cross-examination, Dr. Van Eys testified that she spent six hours reviewing Defendant's juvenile and DCS records, three hours speaking with Defendant face-to-face, two hours speaking with defense counsel, and had a "short interview" with a guard whom Defendant assaulted during his time in a juvenile correction facility. Dr. Van Eys said that the guard from the juvenile facility stated that Defendant needed better friends and a mentor. Dr. Van Eys agreed that Defendant was a danger to the citizens of Davidson County and that he needed rehabilitation.

In a written order, the trial court stated that it considered:

> (1) the evidence received at the sentencing hearing; (2) the pre[-]sentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the enhancement and mitigating factors; (6) statistical information provided by the administrative office of the courts as to sentencing practices for similar

offenses in Tennessee; (7) the result of the validated risk and needs assessment conducted by the department and contained in the presentence report; and (8) the potential for rehabilitation or treatment.

The trial court applied enhancement factor (1), that Defendant "has a previous history or criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range." Tenn. Code Ann. § 40-35-114(1) (2018). The trial court supported this finding by citing that Defendant was adjudicated delinquent as a juvenile for "two charges of evading arrest, aggravated robbery, aggravated criminal trespass, resisting a stop, frisk, or arrest, and disorderly conduct."

The trial court applied mitigating factor (13), "any other factor consistent with the purposes" and of sentencing, by considering Defendant's life experiences to be "extraordinarily difficult." Tenn. Code Ann. § 40-35-113(13) (2018). The trial court summarized Dr. Van Eys's findings and stated, "While these experiences do not eliminate [D]efendant's culpability for the commission of the violent and dangerous offenses at issue in this case, the [c]ourt has considered this background in making its sentencing determinations." Moreover, the trial court found a mitigating factor to be that Defendant voluntarily released the victim alive.

The trial court sentenced Defendant as a Range I standard offender as follows:

1) In count one, aggravated robbery, to ten years with an 85% release eligibility;

2) In count two, especially aggravated kidnapping, to nineteen years with a 100% release eligibility;

3) In count three, evading arrest, to three years with a 30% release eligibility; and

4) In count four, theft of property valued between $1,000 and $10,000, to three years with a 30% release eligibility.

The trial court aligned all four sentences concurrently, for an effective sentence of nineteen years with a 100% release eligibility. The court opined that it did "not believe that [D]efendant is beyond rehabilitation, and is hopeful that [D]efendant learns from his time in incarceration and engages in a productive life when released."

Defendant filed a timely motion for new trial, which the trial court denied. Defendant now timely appeals.

- 13 -

## Analysis

On appeal, Defendant argues that the State delayed disclosure of obviously exculpatory evidence in violation of *Brady v. Maryland*; that the trial court erred by admitting Co-Defendant Hendricks's mugshot in violation of Tennessee Rule of Criminal Procedure 16; that the trial court erred by admitting photographs from Defendant's Facebook profile; that the evidence was insufficient to support his convictions; that the trial court erred by denying his Motion for Judgment of Acquittal; and that the trial court erred by imposing an excessive sentence.

The State responds that the State did not violate *Brady*; that the trial court did not abuse its discretion in admitting photographs; that the trial court properly sentenced Defendant; and that the evidence was sufficient to support Defendant's convictions.

### 1. Alleged Brady Violation

Defendant argues that the trial court erred when it denied his motion to dismiss due to a *Brady* violation. Defendant asserts that the report showing an attempted analysis of the cell phone and the report showing a lack of latent prints lifted from the firearm were obviously exculpatory and that, even if they were not, defense counsel made several pretrial discovery requests. He argues that the reports were "exculpatory and favorable" because "the State was unable to recover any data from this phone considering that it played such a pivotal role" in the offenses and because "the State was unable to lift prints from the recovered firearm[.]" Defendant asserts that "[a] pattern of late disclosures had previously occurred in this case, and the State's delayed disclosure of this information prejudiced [Defendant] in that it prohibited him from presenting his defense on his originally scheduled trial date, and from effectively preparing for trial." Finally, he argues that the continuance granted by the trial court after the evidence was provided prejudiced him by violating his right to a speedy trial.

The United States Supreme Court stated in *Brady v. Maryland* that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. The State is responsible to disclose "any favorable evidence known to the others acting on the government's behalf in the case, including police." *Strickler v. Greene*, 527 U.S. 263, 307 n.12 (1999).

Four prerequisites must be satisfied to establish a *Brady* violation:

- 14 -

1. The defendant must have requested the information (unless the evidence is obviously exculpatory, in which case the State is bound to release the information whether requested or not);

2. The State must have suppressed the information;

3. The information must have been favorable to the accused; and

4. The information must have been material.

*State v. Edgin*, 902 S.W.2d 387, 389 (Tenn. 1995), *as amended on reh'g* (July 10, 1995). Even if the defendant does not specifically request evidence, favorable evidence is material, and its suppression is a constitutional violation, "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). "Reasonable probability" is defined as "a probability sufficient to undermine confidence in the outcome." *Id.*

"Generally, if there is only a delayed disclosure of information, in contrast to a complete failure to disclose exculpatory information, *Brady* normally does not apply, unless the delay itself causes prejudice." *Larry McKay v. State*, No. W2008-02274-CCA-R3-PD, 2010 WL 2384831, at *8 (Tenn. Crim. App. June 15, 2010) (quoting *State v. Caughron,* 855 S.W.2d 526, 548 (Tenn. 1993) (Daughtrey, J., dissenting)), *perm. app. denied* (Tenn. Jan. 13, 2011). "Delayed disclosure results in prejudice to the defendant and may deny the defendant due process when it is too late for the defendant to make use of any benefits of the evidence." *State v. Sidney M. Ewing*, No. 01C01-9612-CR-00531, 1998 WL 321932, at *8 (Tenn. Crim. App. June 19, 1998), *opinion vacated and reentered*, No. 01C01-9612-CR-00531, 1998 WL 485614 (Tenn. Crim. App. Aug. 18, 1998) (internal citation omitted).

Initially, we note that the trial court found that the prosecutor did not intentionally or grossly negligently delay disclosure of the reports at issue on appeal. However, we agree with Defendant that the prosecutor's lack of bad faith is irrelevant to a *Brady* analysis. *Brady*, 373 U.S. at 87.

However, Defendant cannot show that there was "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682. The evidence against Defendant was overwhelming. The victim testified that she was "absolutely positive" that Defendant was her assailant, Defendant was arrested shortly after fleeing from the victim's stolen vehicle, and Defendant had possession of the victim's driver's license. Additionally, the delayed

disclosure of the reports was not "too late for [D]efendant to make use of any benefits of the evidence" because Defendant had the option to show at trial that the State did not lift his fingerprints from the recovered revolver and did not glean any inculpatory evidence from the cell phone. *See Sidney M. Ewing*, 1998 WL 321932, at \*8. In fact, defense counsel cross-examined Officer Caruth about the request to fingerprint the firearm and cross-examined Detective Haislip about his failure to glean any information from the cell phone. Finally, when the trial court granted an almost three-month delay, it noted that Defendant was "in custody on other charges" and concluded that the delay would not "rise to the level of denying his right to a reasonable trial date[.]" We agree. *State v. Bates*, 313 S.W.3d 265, 270 (Tenn. Crim. App. 2009) (finding no prejudice in a twenty-year delay for sentencing because the defendant was incarcerated during that time on other charges); *see also State v. Ricky Grover Aaron*, No. M2002-02288-CCA-R3-CD, 2004 WL 1533825, at \*6 (Tenn. Crim. App. July 8, 2004) (finding no prejudice to a delay of approximately four years between indictment and trial because the defendant was incarcerated in federal prison on other charges), *perm. app. denied* (Tenn. May 2, 2005). Defendant suffered no prejudice from the delayed disclosure of the reports, and he is not entitled to relief on this issue.

### 2. Admission of Mugshot

Defendant argues that the trial court erred in admitting Co-Defendant Hendricks's mugshot because it granted Defendant's motion in limine excluding all evidence not provided in discovery. He asserts that, pursuant to his request under Tennessee Rule of Criminal Procedure 16, the mugshot was "material to preparing a defense" because his defense theory was one of mistaken identity. Defendant argues that the trial court erred in ruling that the State was not required to provide a copy of the mugshot under Rule 16 when it concluded that the State could "not have been aware that the photo was material to the preparation of the defense[.]" Finally, Defendant argues that he was prejudiced by "bad faith, intentional disregard of the rules of discovery, and deliberate withholding of the photograph to gain a tactical advantage." In support of this argument, Defendant claimed:

> defense counsel had no access to the RMS system; the State printed its copy of the photo from the RMS system at 8:23 a[.]m[.] on the morning that opening statements were heard, indicating that [the prosecutor] planned to use it; the State mentioned [Co-Defendant] Hendricks in its opening statement; the State was aware of the relevance of the photo; and that the defense had still not seen or been provided with a copy of that photo as of the moment when the State sought permission to introduce it.

In its brief, the State responds that there was no discovery violation solely based on the fact that the prosecutor did not use the mugshot in his case-in-chief. However, that is

only one of three types of evidence that are subject to Tennessee Rule of Criminal Procedure 16. Rule 16 requires the State, upon the defendant's request, to permit a defendant to inspect and copy books, papers, documents, and other tangible objects if the item is within the State's possession, custody, or control and: (1) the item is material to preparing the defense; (2) the State intends to use the item in its case-in-chief at trial; or (3) the item was obtained from or belongs to the defendant. Tenn. R. Crim. P. 16(a)(1)(F).

In overruling defense counsel's objection to the admission of the mugshot, the trial court said that, if the State did not know what the defense theory was, then "they don't know that it's material." The trial court concluded, "[S]hould the State have been aware that a photo of [Co-Defendant] Hendricks would be material to preparing the defense? The answer to that is no."

Regarding the materiality standard under Rule 16, this court has explained:

In determining the proper standard, we believe that it is appropriate to refer to federal authority interpreting Rule 16(a), Fed. R. Crim. P., because our Rule 16 conforms with and was greatly derived from its federal counterpart. Materiality means more than that the evidence in question bears some abstract logical relationship to the issues in the case. There must be some indication that the pretrial disclosure of the disputed evidence would have enabled the defendant significantly to alter the quantum of proof in his favor. This definition of materiality is not restricted to exculpatory evidence because the discovery of inculpatory evidence may enable the defendant to alter the quantum of proof in his favor in several ways: by preparing a strategy to confront the damaging evidence at trial; by conducting an investigation to attempt to discredit that evidence; or by not presenting a defense which is undercut by such evidence. In order to be material, the discoverable item must significantly help[] in uncovering admissible evidence, aiding witness preparation, corroborating testimony, or assisting impeachment and rebuttal.

*State v. Thomas Dee Huskey*, No. E1999-00438-CCA-R3-CD, 2002 WL 1400059, at *59 (Tenn. Crim. App. June 28, 2002) (internal quotations and citations omitted), *perm. app. denied* (Tenn. Feb. 18, 2003).

Defendant argues on appeal that the prosecutor knew that Co-Defendant Hendricks's mugshot was "material to the defense." The following exchange occurred between the trial court and defense counsel during the July 5, 2018 hearing on the motions in limine:

- 17 -

THE COURT: And [Defendant] is saying that he's not the perpetrator of these crimes, right?

[DEFENSE COUNSEL]: Right.

Further, the trial court, prosecutor, and defense counsel had lengthy pretrial discussions regarding the admissibility of Defendant's Facebook photographs, and the prosecutor repeatedly argued that the Facebook photographs were relevant to show that Defendant had similarities to the assailant as described by the victim. It was quite clear from the pretrial discussions that the identity of the perpetrator was at issue. Additionally, the State printed out the photograph of Co-Defendant Hendricks on the morning before trial, before the defense proffered its theory of mistaken identity during opening argument. While the State is not required to anticipate every possible defense theory in disclosing material evidence under Rule 16, *see e.g., United States v. Viviene Lee Hopkins*, No. 94-1337, 1995 WL 70162 at *3 (1st Cir. 1995), based upon pretrial discussions and the pretrial printing of the mugshot, we conclude that the mistaken identity theory here was obvious to all. If defense counsel had access to the State's photograph of Co-Defendant Hendricks, arguably she would not have "present[ed] a defense which [was] undercut by such evidence[,]" namely, that the kidnapper was actually Co-Defendant Hendricks. *See Thomas Dee Huskey*, 2002 WL 1400059, at *59. We conclude that the State knew or should have known that Co-Defendant Hendricks's mugshot was clearly material to preparing a defense under Rule 16. Regardless of whether the mugshot was entered as rebuttal proof, the withholding of the mugshot constitutes a Rule 16 violation. *State v. Marlos Shields*, No. W2007-01721-CCA-R3-CD, 2009 WL 2047588, at *3-4 (Tenn. Crim. App. July 15, 2009) (finding a Rule 16 discovery violation where the State withheld the contents of the defendant's oral statement that was later introduced by the State as rebuttal proof), *perm. app. denied* (Tenn. Dec. 14, 2009); *State v. Ronald Mitchell*, No. 02C01-9702-CC-00070, 1997 WL 567913, at *3 (Tenn. Crim. App. Sept. 15, 1997) ("[T]he burden is on the State, regardless of what it thinks the [d]efendant is aware of, to assure that discovery is provided" under Rule 16.), *perm. app. denied* (Tenn. Apr. 27, 1998).

Nevertheless, Defendant has not established that the Rule 16 violation prejudiced him. When arguing that a Rule 16 violation requires reversal, the defendant bears the burden of showing "the degree to which the impediments to discovery hindered trial preparation and defense at trial." *State v. Brown,* 836 S.W.2d 530, 548 (Tenn. 1992). Defendant and Co-Defendant Hendricks had some similarities of appearance, such as their race, build, and hairstyle. Defense counsel certainly had the option to argue to the jury, based on the admitted mugshot, that the similarities between Defendant and Co-Defendant Hendricks supported his theory of the victim's mistaken identity. Indeed, defense counsel elicited from Detective Moore that Defendant and Co-Defendant Hendricks "looked much the same." On appeal, Defendant does not argue that he and Co-Defendant Hendricks are

- 18 -

so dissimilar in appearance as to undermine his theory of mistaken identity. Indeed, the only prejudice that Defendant claims is that the State violated the rules of discovery and that he was entitled to the mugshot because it was material. As such, Defendant has not established that "the pretrial disclosure of the disputed evidence would have enabled [him] significantly to alter the quantum of proof in his favor." *Thomas Dee Huskey*, 2002 WL 1400059, at *59. Defendant has not carried his burden and is not entitled to relief.

### 3. Admission of Facebook Photographs

Defendant argues that the trial court erred in admitting four photos from his Facebook profile that depicted him and other young men wielding handguns, smoking what could be construed to be marijuana, and "flashing hand signs" that could be construed to be gang signs. Defendant contends that the probative value of these photographs was substantially outweighed by their unfair prejudice in violation of Tennessee Rule of Evidence 403 and that they were admitted as propensity evidence in violation of Tennessee Rule of Evidence 404(b). Defendant asserts that the State admitted the photographs to show that Defendant matched the victim's description because he wore red pants and a black cap. He argues that wearing red pants and a black cap is a general description that could apply to any number of men in Nashville, thus reducing the photographs' probative value. He contends that the gun recovered at his arrest was not one of the guns in the photographs, further reducing their probative value. Defendant argues that, while owning a handgun is not inherently a crime or bad act under Rule 404(b), in combination with the depiction of drug use and gang signs, the photographs showed "much more than mere ownership or possession of guns[.]"

The State responds that, because Defendant argued mistaken identity at trial, the State was entitled to present evidence of Defendant wearing the hair style and clothing as described by the victim. Alternatively, the State argues that Defendant has not established that any error affected the judgment or resulted in prejudice to the judicial process.

### a. Rule 404(b)

Rule 404(b) of the Tennessee Rules of Evidence provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:

> (1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

*See also State v. Thacker*, 164 S.W.3d 208, 240 (Tenn. 2005); *State v. Parton*, 694 S.W.2d 299, 302 (Tenn. 1985).

One Facebook photograph depicted Defendant smoking an item resembling a marijuana blunt. This is evidence of an uncharged crime, namely, possession of marijuana, and thus, it falls under Rule 404(b). *See State v. McCary*, 922 S.W.2d 511, 514 (Tenn. 1996). However, Defendant did not argue to the trial court that the marijuana photograph was inadmissible under Rule 404(b) but rather that it violated Rules 401 and 403. Because Defendant did not object to the marijuana photograph under Rule 404(b), this issue is waived. Tenn. R. Crim. P. 36(a). Defendant has not requested plain error review of this issue, but, in any event, we determine that plain error review is not necessary to do substantial justice. Tenn. R. App. P. 36(b); *State v. Adkisson*, 899 S.W.2d 626, 640-641 (Tenn. Crim. App. 1994).

Moreover, we reject Defendant's argument that the other three Facebook photographs depicting firearms should have been excluded under Rule 404(b). Mere "possession of a handgun is not a 'bad act' requiring the application of the Rule 404(b)." *State v. Larry E. Orozco*, No. M2017-00327-CCA-R3-CD, 2018 WL 2372197, at *9 (Tenn. Crim. App. May 24, 2018) *no perm. app. filed*; *see also State v. Michael Wright*, No. M2019-00082-CCA-R3-CD, 2020 WL 3410247, at *18 (Tenn. Crim. App. June 22, 2020), *perm. app. denied* (Tenn. Oct. 13, 2020); *State v. Lamantez Desha Robinson*, No. M2016-02335-CCA-R3-CD, 2017 WL 4693999, at *7 (Tenn. Crim. App. Oct. 18, 2017), *perm. app. denied* (Tenn. Feb. 14, 2018). Defendant argues that the combination of the pointed guns with hand signs would have led the jury to conclude that Defendant was a gang member and thus would place the Facebook photographs under Rule 404(b) as propensity evidence. However, the photographs at issue were redacted to remove lettering that could have been associated with a gang, and the only visible hand sign is one photograph with someone other than Defendant holding up what appears to be an "OK" symbol. Therefore, it did not implicate Rule 404(b). *State v. Telvin Toles*, No. W2018-01175-CCA-R3-CD,

2019 WL 2167835, at *11 (Tenn. Crim. App. May 17, 2019) (stating that "because the gesture in question" was made by someone other than the defendant, "regardless of whether it is a gang sign or some other innocent gesture, it does not directly implicate [the d]efendant's character or propensity to commit the crime on trial"), *perm. app. denied* (Tenn. Sept. 20, 2019); *State v. DuBose*, 953 S.W.2d 649, 653 (Tenn. 1997) ("Evidence of crimes, wrongs or acts, if relevant, are not excluded by Rule 404(b) if they were committed by a person other than the accused[.]"). Thus, the admission of these three Facebook photographs does not fall under Rule 404(b).

### b. Rule 403

Defendant also argues that the probative value of the Facebook photographs is substantially outweighed by the danger of unfair prejudice. In order to be admitted into evidence, a photograph must be relevant to an issue that the jury must decide. *State v. Thomas*, 158 S.W.3d 361, 394 (Tenn. 2005). "[E]vidence is relevant if it helps the trier of fact resolve an issue of fact." *State v. James*, 81 S.W.3d 751, 757 (Tenn. 2002) (quoting Neil P. Cohen, et al., *Tennessee Law of Evidence* § 4.01[4], at 4-8 (4th ed. 2000)). However, relevant evidence should be excluded if its prejudicial effect substantially outweighs its probative value. Tenn. R. Evid. 403; *State v. Banks*, 564 S.W.2d 947, 951 (Tenn. 1978). "[T]he admissibility of photographs lies within the discretion of the trial court," whose ruling "will not be overturned on appeal except upon a clear showing of an abuse of discretion." *Id.* at 949.

Rule 403 of the Tennessee Rules of Evidence provides, "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. "Unfair prejudice" is defined as "[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *Banks*, 564 S.W.2d at 951 (quoting Advisory Committee Note to Federal Rule of Evidence 403). This court has also stated that "[p]rejudice becomes unfair when the primary purpose of the evidence at issue is to elicit emotions of 'bias, sympathy, hatred, contempt, retribution, or horror.'" *State v. Collins*, 986 S.W.2d 13, 20 (Tenn. Crim. App. 1998) (quoting M. Graham, *Handbook of Federal Evidence*, 182-83 (2d ed. 1986)). Photographs must never be used "solely to inflame the jury and prejudice them against the defendant." *Banks*, 564 SW.2d at 951. Evidence which only appeals to the sympathies of the jury, conveys a sense of horror, or "engenders an instinct to punish" should be excluded. *Collins*, 986 S.W.2d at 20.

The first two Facebook photographs (the one with Defendant wearing red pants and no shirt and the one of Defendant smoking) were clearly relevant to show that Defendant's

appearance and clothing matched the victim's description. Given Defendant's theory of mistaken identity, photographs corroborating the victim's description and identification of Defendant were highly probative. However, this court agrees that the last two photographs of Defendant pointing guns were unfairly prejudicial because the recovered weapon was not depicted in the photographs, because the photographs did not depict the clothing described by the victim, and because they were unnecessary because other properly admitted photographs showed Defendant's face and hairstyle. *See Michael Wright*, 2020 WL 3410247, at *18 ("The photographs of the [d]efendant with an assault type weapon and with two weapons aimed at the camera were not connected to the [d]efendant's involvement in the offenses and were, therefore, unnecessary, misleading, and unfairly prejudicial.").

Nevertheless, Defendant has not established that the admission of the last two photographs was reversible error. The line between harmless and reversible error "is in direct proportion to the degree of the margin by which the proof exceeds the standard required to convict, beyond a reasonable doubt." *Delk v. State*, 590 S.W.2d 435, 442 (Tenn. 1979). As we explained previously, the evidence here was overwhelming. Thus, the error in admitting the second two Facebook photographs was harmless. Defendant is not entitled to relief.

## 4. Sufficiency of the Evidence

Our standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also* Tenn. R. App. P. 13(e). Questions of fact, the credibility of witnesses, and weight of the evidence are resolved by the fact finder. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh the evidence. *Id.* Our standard of review "is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted).

A guilty verdict removes the presumption of innocence, replacing it with a presumption of guilt. *Bland*, 958 S.W.2d at 659; *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The defendant bears the burden of proving why the evidence was insufficient to support the conviction. *Bland*, 958 S.W.2d at 659; *Tuggle*, 639 S.W.2d at 914. On appeal, the "State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." *State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007).

Moreover, under Tennessee Rule of Criminal Procedure 29, a trial court "shall order the entry of judgment of acquittal of one or more offenses charged in the indictment, presentment, or information after the evidence on either side is closed if the evidence is insufficient to sustain a conviction of such offense or offenses." Tenn. R. Crim. P. 29(b). Whether to grant a motion for judgment of acquittal is a question of law, and the trial court must look at the State's evidence in the light most favorable to the State and must "allow all reasonable inferences from it in the State's favor; to discard all countervailing evidence, and if then, there is any dispute as to any material determinative evidence, or any doubt as to the conclusion to be drawn from the evidence of the State," the trial court must deny the defendant's motion for judgment of acquittal. *State v. Hall*, 656 S.W.2d 60, 61 (Tenn. Crim. App. 1983). In ruling on a motion for judgment of acquittal, the trial court looks at the legal sufficiency of the evidence and does not weigh the evidence. *Id.* "The standard by which the trial court determines a motion for a judgment of acquittal is, in essence, the same standard that applies on appeal in determining the sufficiency of the evidence after a conviction[,]" whether, when the evidence is viewed in the light most favorable to the State, any rational juror could have found the defendant guilty of the offense beyond a reasonable doubt. *State v. Collier*, 411 S.W.3d 886, 893-94 (Tenn. 2013).

The identity of the perpetrator is "an essential element of any crime." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006). Identity may be established with circumstantial evidence alone, and the "jury decides the weight to be given to circumstantial evidence, and [t]he inferences to be drawn from such evidence . . . ." *Id.* (internal quotation marks omitted). The question of identity is a question of fact left to the trier of fact to resolve. *State v. Crawford*, 635 S.W.2d 704, 705 (Tenn. Crim. App. 1982).

### a. Count One: Aggravated Robbery

As pertinent here, aggravated robbery is robbery that is "accomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon[.]" Tenn. Code Ann. § 39-13-402(a)(1) (2016). "Robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a) (2016). "A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." Tenn. Code Ann. § 39-14-103(a) (2016).

Here, the victim testified that Defendant forced her at gunpoint to drive her car to an apartment complex, where he left her and took her vehicle and driver's license. The victim testified that she was "absolutely positive" that Defendant was the person who threatened her with a gun and stole her vehicle. The victim stated that Defendant made a phone call while she was driving and that he gave her address to the person on the other

- 23 -

end of the call with instructions to "kill everyone in the home" if he went to jail for stealing her car. Defendant was apprehended six days later after a police chase in which Defendant and Co-Defendant Hendricks wrecked the victim's vehicle. Defendant also had possession of the victim's driver's license. The evidence was overwhelming that Defendant put the victim in fear with a deadly weapon and intentionally stole her property.

### b. Especially Aggravated Kidnapping

As relevant here, especially aggravated kidnapping is false imprisonment "[a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon[.]" Tenn. Code Ann. § 39-13-305(a)(1) (2016). "A person commits the offense of false imprisonment who knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty." Tenn. Code Ann. § 39-13-302(a) (2016).

When Defendant forced the victim into her car at gunpoint to drive to an apartment complex, he confined her unlawfully and interfered substantially with her liberty while using a deadly weapon. The evidence was sufficient to support Defendant's conviction for especially aggravated kidnapping.

### c. Evading Arrest in a Motor Vehicle with Risk of Death or Injury

"It is unlawful for any person, while operating a motor vehicle on any street, road, alley or highway in this state, to intentionally flee or attempt to elude any law enforcement officer, after having received any signal from the officer to bring the vehicle to a stop." Tenn. Code Ann. § 39-16-603(b)(1) (2016). "If the flight or attempt to elude creates a risk of death or injury to innocent bystanders, pursuing law enforcement officers, or other third parties, a violation of this subsection (b) is a Class D felony." Tenn. Code Ann. § 39-16-603(b)(3)(B) (2016).

"A person is criminally responsible as a party to an offense, if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." Tenn. Code Ann. § 39-11-401(a) (2016). As pertinent here, a person is criminally responsible for the conduct of another when, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense[.]" Tenn. Code Ann. § 39-11-402(2) (2016). Criminal responsibility is not a separate crime but instead a theory by which the State may prove the defendant's guilt based upon another person's conduct. *State v. Osborne*, 251 S.W.3d 1, 16 (Tenn. Crim. App. 2007) (citing *State v. Mickens*, 123 S.W.3d 355, 389-90 (Tenn. Crim. App. 2003)).

- 24 -

"[U]nder the theory of criminal responsibility, presence and companionship with the perpetrator of a felony before and after the commission of the crime are circumstances from which an individual's participation may be inferred." *State v. Phillips*, 76 S.W.3d 1, 9 (Tenn. Crim. App. 2001). In order to be convicted of the crime, the evidence must establish that the defendant in some way knowingly and voluntarily shared in the criminal intent of the crime and promoted its commission. *State v. Maxey*, 898 S.W.2d 756, 757 (Tenn. Crim. App. December 8, 1994); *State v. Foster*, 755 S.W.2d 846, 848 (Tenn. Crim. App. 1988).

Detective Moore testified that, after he "ran a tag" on the victim's vehicle and learned that it was stolen, he followed the car at a safe distance. When the car suddenly began to accelerate at a high rate of speed and almost caused a wreck, Detective Moore activated his blue lights. The car continued to evade Detective Moore's pursuit, speeding through rush hour traffic. Detective Moore explained that the vehicle "crossed into oncoming traffic two separate times" and almost caused an accident. Officer Caruth also testified that he saw the vehicle pass by him, he pulled out behind it, and activated his blue lights. He chased the vehicle until it crashed at a home on Neely's Bend.

Officer Caruth testified that, after the accident, Co-Defendant Hendricks exited the driver's side first, indicating to him that Co-Defendant Hendricks was the driver during the chase. Defendant exited after Co-Defendant Hendricks, and the two co-defendants attempted to elude the officers on foot. Defendant's "presence and companionship" with Co-Defendant Hendricks "before and after the commission of the crime" of evading arrest in a motor vehicle are circumstances from which Defendant's participation in the crime may be inferred. *Phillips*, 76 S.W.3d at 9. Moreover, Defendant's attempted flight on foot with Co-Defendant Hendricks following the crash was sufficient to establish that Defendant knowingly and voluntarily shared in the criminal intent of evading arrest in a motor vehicle and promoted its commission. *Maxey*, 898 S.W.2d at 757; *Foster*, 755 S.W.2d at 848. The evidence was sufficient to support Defendant's conviction for evading arrest in a motor vehicle with risk of injury or death to bystanders under a theory of criminal responsibility.

### d. Theft of Property valued between $1,000 to $10,000

As previously explained, the evidence was overwhelming that Defendant took the victim's car without her consent. The victim testified that, at the time of the offense, her vehicle was worth $8,000 or $9,000. The evidence was sufficient to support Defendant's conviction for theft of property valued between $1,000 and $10,000.

*5. Sentencing*

Defendant argues that his sentences are excessive because the trial court considered Defendant's juvenile convictions as part of his criminal history and because the trial court did not give proper weight to the mitigating factor of Defendant's very difficult childhood.

The State concedes that the trial court erred in considering Defendant's juvenile record under enhancement factor (1) but asserts that the trial court could have considered his juvenile record under enhancement factor (16). The State contends that the trial court acted well within its broad discretion in determining how much weight to afford the mitigating factor.

When the record clearly establishes that the trial court imposed a sentence within the appropriate range after a "proper application of the purposes and principles of our Sentencing Act," this court reviews the trial court's sentencing decision under an abuse of discretion standard with a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). The party challenging the sentence on appeal bears the burden of establishing that the sentence was improper. Tenn. Code Ann. § 40-35-401 (2018), Sentencing Comm'n Cmts.

To facilitate meaningful appellate review, the trial court must state on the record the factors it considered and the reasons for imposing the sentence chosen. Tenn. Code Ann. § 40-35-210(e) (2018); *Bise*, 380 S.W.3d at 706. While the trial court should consider enhancement and mitigating factors, such factors are advisory only. *See* Tenn. Code Ann. § 40-15-114 (Supp. 2015); *see also Bise*, 380 S.W.3d at 699 n.33, 704; *State v. Carter*, 254 S.W.3d 335, 346 (Tenn. 2008). A trial court's "misapplication of an enhancement or mitigation factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Bise*, 380 S.W.3d at 706.

The sentencing ranges for the offenses of conviction for a Range I standard offender are as follows:

- Aggravated robbery, a Class B felony: range of eight to twelve years. Tenn. Code Ann. §§ 39-13-402, 40-35-112(a)(2) (2018). Defendant received ten years' incarceration with an eighty-five percent release eligibility.

- Especially aggravated kidnapping, a Class A felony: range of fifteen to twenty-five years. Tenn. Code Ann. §§ 39-13-305, 40-35-112(a)(1) (2018). Defendant received nineteen years' incarceration with a 100 percent release eligibility.

- Evading arrest in a motor vehicle with risk of death or injury, a Class D felony: range of two to four years. Tenn. Code Ann. §§39-16-603, 40-35-112(a)(4) (2018). Defendant received three years' incarceration with a thirty percent release eligibility.

- Theft of property valued between $1,000 and $10,000, a Class D felony: range of two to four years. Tenn. Code Ann. §§ 39-14-103, 40-35-112(a)(4) (2018). Defendant received three years' incarceration with a thirty percent release eligibility.

As the State concedes, we agree that the trial court misapplied enhancement factor (1), that Defendant "has a previous history or criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range," because it relied on Defendant's juvenile convictions for this enhancement factor. Tenn. Code Ann. § 40-35-114(1) (2018); *See State v. Jackson*, 60 S.W.3d 738, 742 (Tenn. 2001) (finding that the enhancement factors for extensive criminal history and for adjudication of juvenile delinquency are "mutually exclusive"). However, the trial court could have applied enhancement factor (16), that Defendant "was adjudicated to have committed a delinquent act or acts as a juvenile that would constitute a felony if committed by an adult." Tenn. Code Ann. § 40-35-114(16); *See State v. Michael S. Jackson*, No. W1999-00358-CCA-R3-CD, 2000 WL 33912548, at *5 (Tenn. Crim. App. Nov. 9, 2000) (noting that the trial court improperly applied enhancement factor (1) but stating that the juvenile enhancement factor applied), *aff'd*, 60 S.W.3d 738 (Tenn. 2001). As a juvenile, Defendant was adjudicated delinquent for aggravated robbery,[2] which would have been a felony conviction had he been an adult. Tenn. Code Ann. § 39-13-402(2)(b). Moreover, the trial court imposed mid-range sentences after considering

> (1) the evidence received at the sentencing hearing; (2) the pre[-]sentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the

---

[2] Defendant's presentence report states that his juvenile record is attached; however, his juvenile record does not appear in the record on appeal. In its written sentencing determination, the trial court stated:

> While [D]efendant does not have any prior convictions as an adult, his juvenile record reflects that he was adjudicated delinquent of two charges of evading arrest, aggravated robbery, aggravated criminal trespass, resisting a stop, frisk, or arrest, and disorderly conduct. The [c]ourt recognizes that some of these offenses would only be misdemeanors if [D]efendant had been convicted of them as an adult. However, the [c]ourt is very concerned by [D]efendant's delinquency for aggravated robbery, particularly in light of [D]efendant's actions in this case.

- 27 -

enhancement and mitigating factors; (6) statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) the result of the validated risk and needs assessment conducted by the department and contained in the presentence report; and (8) the potential for rehabilitation or treatment.

Because the trial court could have applied enhancement factor (16), the enhancement of the sentence was not improper.

Moreover, the trial court applied mitigating factor (13), "any other factor consistent with the purposes" of sentencing, when it determined that Defendant's life experiences were "extraordinarily difficult." Tenn. Code Ann. § 40-35-113(13) (2018). It also found a mitigating factor to be that Defendant voluntarily released the victim alive. While Defendant argues that the trial court should have given his mitigating factors greater weight, "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion." *Carter*, 254 S.W.3d at 345. In other words, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" *Id.* at 343. Based upon the seriousness of Defendant's conduct, we conclude that the trial court did not abuse its discretion in determining the weight to be afforded the mitigating factors and in imposing concurrent, mid-range sentences for each count. The sentences were not excessive, and Defendant is not entitled to relief.

## Conclusion

For the foregoing reasons, the judgments of the trial court are affirmed.

_____
ROBERT L. HOLLOWAY, JR., JUDGE

- 28 -